IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

DEREK THOMAS HALL,                    )
     Plaintiff,                        )
                                       )    Civil Action No. 5:14-cv-00037
v.                                    )
                                       )    <u>MEMORANDUM OPINION</u>
CAROLYN W. COLVIN,                    )
Acting Commissioner,                  )    By:    Joel C. Hoppe
Social Security Administration,       )    United States Magistrate Judge
     Defendant.                        )

     Plaintiff Derek Thomas Hall asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying his applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–34, 1381–1383f. The case is before me by the parties' consent

under 28 U.S.C. § 636(c). Having considered the administrative record, the parties' briefs and

oral arguments, and the applicable law, I find that the Commissioner's decision is not supported

by substantial evidence and that remand for further administrative proceedings is necessary.

I. Standard of Review

     The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

Case 5:14-cv-00037-JCH   Document 34   Filed 09/30/16   Page 1 of 23   Pageid#: 1219

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the

2

burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Hall filed for DIB and SSI on February 9, 2011. Administrative Record ("R.") 295, 302, ECF No. 21. He was thirty-six years old at the time, R. 295, and had worked most recently as a game advisor, store manager, truck loader, and wireless services worker, R. 344. Hall alleged disability beginning December 1, 2010,[1] because of stroke, bipolar disorder, and borderline personality disorder. R. 339, 343.

Hall had an administrative hearing before an ALJ on September 11, 2012. R. 39–82. Hall appeared with counsel and testified about his past work, then-current activities, medical conditions, and limitations his conditions caused. A vocational expert ("VE") testified about the nature of Hall's past work and then-current activities as well as his ability to perform other jobs in the national and local economy.

On September 28, 2012, the ALJ issued a written opinion denying Hall's applications. R. 15–33. The ALJ found that Hall had severe impairments of affective disorder, anxiety disorder, personality disorder, substance abuse disorder, and status post cerebrovascular accident, but none of these severe impairments met or equaled a listing. R. 17–19. The ALJ determined that Hall's headaches and obstructive sleep apnea were not severe impairments and his "white outs" were not a medically determinable impairment. R. 18. The ALJ found that Hall had the residual functional capacity ("RFC") to perform a modified range of light work[2] with some postural

---

[1] On October 20, 2014, Hall returned to work. Am. Compl., ECF No. 11; Pl. Br. 1, 7–8, ECF No. 24. He now requests a closed period of benefits from his alleged onset date to the time he returned to work. *Id.*

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do

3

limitations and limitation to simple, routing work involving occasional interaction with co-workers and only incidental interaction with the public. R. 20. Relying on the VE's testimony, the ALJ concluded at step four that Hall could not perform his past work, but that he could perform other jobs in the economy. R. 31–32. He therefore determined that Hall was not disabled under the Act. *Id.* The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

<h3 style="text-align:center">III. Discussion</h3>

In challenging the Commissioner's final decision, Hall argues that the ALJ erred in finding that his headaches were a non-severe impairment and his "white outs" were not a medically determinable impairment. Pl. Br. 4–6. Hall also argues that the ALJ improperly evaluated the opinions of his treating physicians, particularly in rejecting limitations in concentration and regularly attending work. *Id.* at 7.

*A.   Medical Evidence*

The earliest treatment notes in the record begin on January 8, 2008, nearly three years before Hall's alleged onset. R. 511–14. On that date, Laura Tate-Santiago, M.D., conducted an intake evaluation of Hall for psychiatric services at the University of Virginia Health System ("UVAHS"). Dr. Tate-Santiago noted that Hall had been diagnosed with bipolar disorder in 2000. She found that Hall was difficult to assess because his communication style was filled with exaggerations and contradictions. She noted that he experienced panic attacks and anger fits, had interpersonal relationship problems, and had a history of substance abuse. Dr. Tate-Santiago diagnosed bipolar disorder and personality disorder for which she prescribed Depakote and Klonopin. Although Dr. Tate-Santiago diagnosed tension headaches, they did not cause any

---

some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

functional impairment, so she deferred prescribing medication. In June 2008, Dr. Tate-Santiago noted that Hall had been using unprescribed narcotics to treat his headaches and that his primary care physician had prescribed Ultram for migraine headaches. R. 505. Over the course of his treatment, Hall requested Ultram numerous times to treat his headaches. R. 495, 502, 503.

A transfer summary from July 2009 recounts that Hall had been seen every one to two months for medication management for bipolar disorder. R. 488–90. During this time, he continued to experience irritability, depressed mood, fatigue, and lack of motivation, and his interpersonal problems with coworkers and his wife persisted. Nassima Tiouririne, M.D., noted that Hall regularly requested pain medication for a variety of reasons. When confronted with the possibility that he had an opiate addiction, Hall agreed that he had a serious problem with them and would not request them anymore. Dr. Tiouririne questioned the diagnosis of bipolar disorder given Hall's poor self-esteem, poor coping skills, and hypersensitivity to interpersonal issues. She also noted that he would not be prescribed pain medication.

In December 2009, Hall underwent a sleep study. He was diagnosed with severe sleep apnea and provided a Continuous Positive Airway Pressure ("CPAP") machine. R. 638–40, 641–45. By April 2010, Hall's sleep had improved, and he was not fatigued when he woke in the morning. R. 639.

In a discharge summary from July 2010, Nicolas Canon-Salazar, M.D., wrote that since January 2008, the clinic had provided Hall medication management for his affective disorder and episodic opiate abuse. R. 471–73. Hall had exhibited symptoms of depressed mood, moderate anxiety, and severe emotional lability from interpersonal difficulties with his wife. Hall's physicians tried various medications to address these symptoms. Ultimately, Effexor produced progressive improvement of his mood symptoms, and clonazepam significantly reduced his

5

anxiety. To address his interpersonal-relationship problems, Hall was offered group therapy and prescribed various medications, such as Ambien and Lamictal. After Hall's wife mentioned divorce, he experienced passive suicidal ideation and was voluntarily admitted for a week at the Wellness Recovery Center. He was diagnosed with major depressive disorder, opiate abuse, generalized anxiety disorder, migraine headaches, sleep apnea, and chronic interpersonal difficulties. He was assigned a Global Assessment of Functioning ("GAF")[3] score of 61–70.[4]

On July 19, Hall was evaluated by Darin L. Christensen, M.D. R. 849. Hall reported experiencing anger, depression, and trouble with his wife and coworkers. Dr. Christensen noted that Hall was calm and cooperative and had a depressed mood and euthymic, appropriate affect. He diagnosed major depressive disorder and prescribed Klonopin and Ambien. A month later, Hall reported that his wife wanted to separate from him, and Dr. Christensen added prescriptions for Effexor and Seroquel. R. 848. Hall called Dr. Christensen's office multiple times in July and August to request changes in his medications. R. 847–48.

---

[3] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33.

The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation–For Clinicians* (Aug. 1, 2013), http://www.dsm5.org/Documents/FAQ%20for%20Clinicians%208-1-13.pdf. Though GAF scores may be questionable diagnostic tools, changes in assessed scores may still reflect a clinician's observation of improvement or deterioration in their patient.

[4] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

6

On October 7, 2010, Hall was seen by Jonathan Fellers, M.D., for medication management at UVAHS. R. 635–36. Dr. Fellers noted that since Hall began taking a monoamine-oxidase inhibitor ("MAOI") for depression, he had experienced dramatic improvement in mood, anxiety, and interpersonal relationships. On mental status exam, Dr. Fellers noted that Hall had euthymic mood, appropriate affect, and good concentration and memory. He diagnosed Hall with atypical depression, panic disorder with agoraphobia, personality disorder, and economic and psychosocial problems. He assessed a GAF of 61–70 and prescribed clonazepam and gabapentin. At a follow-up in November, Hall expressed worries about separating from his wife and moving out of their residence, although his mood and interpersonal resilience were improved. R. 631–33. After Hall admitted to taking more than the prescribed amounts of MAOIs, Dr. Fellers admonished him not to change his dose unilaterally. Dr. Fellers's observations on mental status exam and his diagnosis were unchanged from October.

On November 23, Hall went to the emergency room complaining of tunnel vision. R. 537–38. Magnetic Resonance Imaging ("MRI") of his brain was ordered because of stroke concerns, and the MRI showed no abnormalities. R. 564. Hall was diagnosed with migraine headache and provided Dilaudid, which helped him rest. R. 538.

A week later Hall told Dr. McLaughlin that he was having trouble urinating and that straining to urinate caused headaches. R. 712–13. Dr. McLaughlin prescribed Fioricet for headaches, warned him of possible addiction, and told him not to drive or work after taking it.

On December 2, Hall had slurred speech, trouble walking and urinating, and blurry vision; he was admitted to the emergency room at Augusta Health Hospital. R. 515–17. Donald S. Molinar, M.D., noted that Hall had a history of depression, prescription drug abuse, and

7

headaches and that the night before Hall had taken too many Fioricet and Nardil. An initial CT scan did not show abnormalities, but an MRI showed acute brain stem infarct of the left pons and severe occlusion of the distal right basal artery. He was diagnosed with left pons cerebrovascular accident, essentially a stroke. After Hall was stabilized, he was transferred to UVAHS and admitted to the Neurology Intensive Care Unit. R. 608–11, 625–28. Over the course of his treatment, Hall's symptoms significantly improved: he had only mild dysarthria and mild right upper extremity weakness and dysmetria. He was prescribed Warfarin and Dalteparin for the stroke and tramadol for pain, and his psychiatric medication was changed to Lexapro. R. 600–03. Upon discharge from the hospital on December 9, Hall was transferred to outpatient rehabilitation where he engaged in physical and occupational therapy.

On December 20, Hall met with Dr. Fellers for medication management. R. 622–24. Dr. Fellers noted that Hall's mood was down since he stopped taking MAOIs three weeks before. They discussed changing his medications, and Dr. Fellers prescribed citalopram and bupropion. Hall saw Dr. McLaughlin twice at the end of December and reported that he was doing much better. R. 704, 706. Although he had some right-sided weakness, he had been playing guitar and thought he was capable of driving. Dr. McLaughlin found that Hall had grossly normal strength and normal gait, but told him not to drive for the next couple of weeks.

On January 3, 2011, Hall told Dr. Fellers that his mood, energy, and interpersonal relationships had improved after he restarted antidepressant medications. R. 620–21. Later that day, Hall saw Dr. McLaughlin and reported that he had been driving and was ready to return to work at Game Stop. R. 702. Dr. McLaughlin cleared him to work. At a subsequent visit in January, Hall reported that he was working four hours a week at Game Stop, had separated from his wife, and was moving into a residence by himself in March. R. 850. On exam, Dr.

8

McLaughlin noted normal gait, strength, sensation, reflexes, speech, and thought processes and no confusion. Hall requested referral to a different psychiatrist than Dr. Fellers, and Dr. McLaughlin referred him to Dr. Christensen.

During an appointment on February 9, Hall told Dr. Christensen about his stroke and that his wife planned to divorce him. R. 847. Dr. Christensen prescribed Ambien and another medication that is illegible.

At a follow-up appointment on February 28, Dr. Fellers confronted Hall with a report that he had filled a prescription for clonazepam and had seen another psychiatrist and received prescriptions for lorazepam and zolpidem. R. 617–19. Hall said he had thrown away those medications. Dr. Fellers told Hall he would not prescribe any more controlled substances; Hall responded, "you're fired." Dr. Fellers added the diagnosis of benzodiazepine dependence and closed Hall's chart permanently. R. 617–19. During this session, as at each of Hall's post-stroke assessments, Dr. Fellers found that Hall had good memory and concentration. R. 618, 620, 623.

On March 18, Hall told Dr. McLaughlin that Dr. Christensen had prescribed a new MAOI, which had improved his mood. He also said that he had been having headaches later in the day for about a week and a half. R. 942. He described the headaches as starting in the front of his head and moving to the back. He did not experience photophobia. Tylenol was not effective in controlling the headaches, but Hall took some leftover Skelaxin, which eased his pain. Dr. McLaughlin performed a neurological exam and found normal strength, gait, sensation, and reflexes. He also found that Hall exhibited linear thought process and no confusion. Dr. McLaughlin attributed the headaches to tension and prescribed Skelaxin.

In March, Hall told Dr. Christensen about his continuing problems with his wife, including someone posting insulting notes on Facebook, and Dr. Christensen added Parnate to

9

his prescriptions. R. 846. Hall also began outpatient counseling. R. 1071–73. Dr. Christensen completed a Mental Status Evaluation Form on April 7, 2011. R. 841–45. He reported that Hall had depressed mood, but his memory, attention span, concentration, persistence, and task completion were within normal limits. Dr. Christensen observed that Hall had "improved significantly since recent medical illness and marital problems" and that he was capable of independently performing activities of daily living.

On April 12, Hall had a brain MRI and head and neck MRI angiogram ("MRA"). R. 1053–55. The brain MRI showed chronic left pontine infarct, and the head MRA showed residual irregularity of the V3 segments of the vertebral arteries with significant internal improvement suggestive of interval healing. The attending physician noted no other abnormalities.

On April 18, Hall told Dr. Christensen that he was still weak on his right side and he was not sleeping well. R. 1062. During a visit with Dr. Christensen on May 5, Hall said he had been working at Game Stop, but was unable to handle a full workweek, so he was applying for disability. R. 1063. Hall said he had experienced headaches, agitation, shortness of breath, and feelings of vulnerability, and he had thought about fleeing his situation. Later in May, Hall told Dr. Christensen that he had been attending therapy sessions, *see* R. 1067–73, the MAOIs helped, and he felt lonely, but not clinically depressed. *Id.* At each visit, Dr. Christensen continued his medications. R. 1062–63. In June and August, Hall told Dr. Christensen about his difficulties with his wife over visitation and custody of their son. R. 1064.

On June 11, Dr. Christensen completed a mental residual functional capacity questionnaire. R. 864–68. He noted that Hall had A-type bipolar affective disorder, which was stable on medication. Dr. Christensen identified various signs and symptoms, including

decreased energy, generalized persistent anxiety, difficulty thinking or concentrating, persistent disturbances of mood or affect, intense and unstable interpersonal relationships, emotional lability, easily distractible, and memory impairment. He opined that Hall was seriously limited, but not precluded in remembering work-like procedures, maintaining attention for two-hour segments, maintaining regular attendance and normal punctuality, completing a normal workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without unreasonable breaks, and setting realistic goals or making plans independently. In all other areas, except neatness and cleanliness, his ability was limited, but satisfactory. Hall was likely to miss more than four days of work per month.

Meanwhile, Hall continued treatment with Dr. McLaughlin. On May 18, Hall told Dr. McLaughlin that his mood was good and that he had been playing guitar. R. 886–87, 933–34. He reported the same headache symptoms as in March. Neurological exam was again normal. Dr. McLaughlin assessed possible migraine headache related to tension and prescribed Robaxin. On June 2, Hall said his therapy and medications helped his depression "a lot." R. 883, 929. He also reported that his headaches had improved significantly and that Robaxin was helpful. At an appointment on July 6, Dr. McLaughlin examined Hall and found that all neurological signs were normal. Hall and Dr. McLaughlin also discussed an episode from the day before when Hall had experienced dizziness, off-and-on headaches, and other symptoms that Hall said were similar to a stroke. R. 876, 917. During that episode, Hall had called Dr. McLaughlin's office and was told to go to the emergency room. Hall did so, but left the emergency room after a few hours before he was examined. At an appointment one week later, Hall gave Dr. McLaughlin disability forms to complete. Hall told Dr. McLaughlin about his various symptoms and limitations, including right-sided weakness, balance and coordination problems, loss of manual dexterity in

11

his right hand, unstable walking, fatigue, nausea, headaches, problems concentrating and remembering, impaired judgment, and dizziness. R. 874, 915. He said he could stand for two hours, after which he would feel faint and need to sit. On exam, Dr. McLaughlin found slightly decreased strength in Hall's right arm, hand, and leg, but his findings were otherwise normal. Hall reported experiencing headaches off and on. At the time his headache was not bad, but it sometimes got worse.

In a residual functional capacity questionnaire, Dr. McLaughlin identified Hall's symptoms of balance problems, poor coordination, loss of manual dexterity, unstable walking, falling spells, fatigue, nausea, headaches, difficulty remembering, depression, and problems with judgment. R. 858–63. Additionally, Hall had significant and persistent disorganization of motor function that disturbed his gross and dexterous movement and gait. Dr. McLaughlin opined that Hall's symptoms would often interfere with his attention and concentration. Hall could sit for four hours and stand or walk for two hours in an eight-hour workday, and he would need to take unscheduled breaks every two hours for fifteen minutes each. He could occasionally lift up to ten pounds, and he had some postural, right-handed manipulation, and environmental restrictions. Dr. McLaughlin opined that Hall was capable of working low-stress jobs, such as his current job. He was likely to miss work for more than four days a month, and his migraines, bipolar disorder, and depressive disorder would limit his ability to work on a sustained basis.

Hall had a neurological follow-up with Michael Brogan, M.D., on August 30, 2011. R. 1049–52. Hall told Dr. Brogan that his right hemiparesis had nearly totally resolved and his dysarthria had resolved. Further, Hall had returned to singing and playing guitar and expected to go on tour in a few months. Hall's primary concern was headache that he experienced three to four times a week and that lasted for three to four hours. He described his headaches as

12

beginning with a white light in both eyes, followed by pain, photophobia, mild dizziness, and nausea. According to Hall, these current headaches were different than the migraine headaches he had been treated for in the past. The medications he had taken for migraine headaches did not alleviate his current headache symptoms, but using marijuana helped. Dr. Brogan conducted a neurologic exam and found that Hall was fully oriented and had intact memory and attention. His mental status, cranial nerves, motor, sensory, coordination, station and gait, and reflexes were all normal. Dr. Brogan determined that Hall did not need any further imaging or follow-up with the Stroke Clinic. He discontinued Warfarin and recommended that Hall take a daily aspirin. Dr. Brogan assessed "chronic daily headaches manifesting as migraine with aura," prescribed propranolol and naproxen, and provided standard headache instructions concerning sleep, diet, exercise, and relaxation. He scheduled a follow-up with the Headache Subspecialty Clinic for February 2012.

On November 7, 2011, Hall reported to Dr. McLaughlin that he had been experiencing headaches and intermittent vision problems for the past two to three months. R. 1084–86. Hall said the headaches come and go and that the naproxen and propranolol had not helped, so he stopped using them. He complained of photophobia and was wearing sunglasses. On exam, Dr. McLaughlin found mild photophobia, but otherwise his findings, including neurological and psychiatric, were normal. Dr. McLaughlin said he would try to get Hall an appointment with the Neurology Clinic to assess his headaches before his scheduled appointment in February, and he referred Hall to an ophthalmologist.

On January 26, 2012, Hall saw Douglas DeGood, Ph.D., for behavioral assistance in managing headaches. R. 1091–92. Hall reported his social history and headache symptoms. On mental exam, Hall was alert and oriented with a moderate degree of restless psychomotor

13

agitation. Because Hall moved rapidly from thought to thought, Dr. DeGood could not assess whether he had deficits in attention, memory, or reasoning. Hall's mood was stable. Dr. DeGood noted that he did not have adequate time during this session to obtain a detailed history or to conduct physiologic monitoring. Dr. DeGood diagnosed migraine headaches, stress related physiologic response affecting medical condition, bipolar disorder, and stroke rehabilitation. He recommended relaxation techniques so that Hall could self-regulate his jaw-muscle tension. Although Dr. DeGood planned for a follow-up session, the record does not contain notes of another session.

On May 9, Gerald R. Showalter, Psy.D., conducted a neuropsychological evaluation of Hall for the stated purpose of diagnosis and rehabilitation planning. R. 1094–99. Hall provided information about his medical history, including the circumstances of his stroke and psychiatric treatment with Dr. Christensen. Hall described his migraine headaches as beginning with "white outs" that prevented him from seeing anything and caused him to "drop to the floor and to breathe deep to relax." He experienced these episodes three to four times a week. Hall also recounted his social history, which Dr. Showalter noted was marked with grandiose and bizarre thinking, including that Hall had toured with the Dave Matthews Band; Hall's purpose in life was to assist others, essentially functioning as Jesus Christ; and Hall had an IQ of 155. Hall discussed his marriage and divorce and limited social interactions. Hall reported that at that time he worked four hours a week at Game Stop and volunteered at a library. He also cooked, cleaned, and did laundry without difficulty. Dr. Showalter observed that Hall was alert, oriented, and cooperative, but he was anxious and easily distracted.

As part of this evaluation, Hall also completed testing in intellectual functioning, academic functions, attention/concentration, reasoning/cognitive flexibility, motor functions,

14

language functions, learning and memory, and personality/emotional functioning. Results showed that Hall performed in the low average to average or higher categories in verbal intellectual efficiency, auditory attention/working memory, verbal fluency, word reading, spelling, math, and delayed verbal memory. Hall's performance was below average or impaired in visuomotor processing speed, complex (alternating) attention, visual reasoning/concept formation, bilateral upper extremity motor speed with greater impairment on the right, reading comprehension, and visuoconstructive skills. He had markedly impaired visuoperceptual planning and organizational capabilities, and below average visual memory. Hall showed significant rumination or preoccupation with his health and life difficulties. Dr. Showalter opined that his findings may reflect the neurobehavioral effects of Hall's stroke, mood instability, depression, and maladaptive personality traits, and he recommended ongoing psychotherapy. Considering these results, Dr. Showalter offered a guarded prognosis of Hall's ability to work. He recommended that Hall implement strategies to aid his memory and ability to complete multiple-step tasks. Additionally, he found that Hall may require more time than normal to complete daily tasks.

Also on May 9, Mammen M. Mathew, M.D., evaluated Hall's physical residual functional capacity. R. 1100–04. Hall discussed his medical history and identified his "primary problem [as] migraine headaches associated with episodes of 'white outs.'" R. 1100. Hall described his headaches as he had to Dr. Showalter, but said they occurred almost daily and precluded him from functioning for four to six hours. Mental status and physical exams were normal, except that Hall exhibited some weakness in his right upper and lower extremities and had some difficulty tandem walking, but had an otherwise normal gait. Dr. Mathew found that Hall was vocationally limited because of his almost daily "white outs" and headaches.

15

B.     *Hall's Statements*

Hall's ex-wife completed a functional report of Hall. R. 373–83. She reported that Hall had right-sided weakness and difficulty walking or standing for a long time. Particularly after his stroke, Hall had trouble getting along with others and was depressed. Hall cooked, cleaned the house some, did the laundry, drove a car, shopped in stores, watched television, played video games, read, used a computer, and spent time with his son.

In addition to the activities identified by his ex-wife, Hall said he took care of a cat and studied for fun. R. 385–92. He had difficulty walking, talking, lifting, squatting, bending, standing, reaching, climbing stairs, seeing, using his hands, and getting along with others, but he did not have problems with memory, concentration, or task completion.

At the administrative hearing, Hall described the "white outs" followed by migraine headaches.  R. 46, 48. He said he had balance, coordination, and right-handed dexterity problems following his stroke. R. 47–48. He felt anxious, guilty, and depressed, and he had memory problems and difficulty concentrating. R. 49–52. He was easily distracted and socially withdrawn. R. 52. He described problems he had with coworkers and a boss at two jobs. R. 53. Hall testified that he currently worked at Game Stop for four hours every few weeks and he volunteered at a library for two hours a week. R. 55, 57–58, 62. At Game Stop, Hall would have to take two fifteen-minute breaks every four hours, and he would take a break to avoid provoking a "white out" when his duties required him to bend down repeatedly to pick up discs and shelve them. R. 58. He drove a car, but limited the distance to twenty miles. R. 63. Hall did various activities with his son, such as watching movies and visiting comic book stores. R. 64. He also conducted recording sessions using his computer, and in one instance he worked two hours a day, two to three times a week on a recording project for his friend's son. R. 67–69.

16

C.    *State Agency Physicians' Opinions*

In April 2011, William Amos, M.D., and John Kalil, Ph.D., reviewed Hall's medical records and statements for the state agency. R. 83–95. Dr. Amos determined that Hall could perform light work with some postural limitations. Dr. Kalil determined that Hall was moderately limited in his ability to work with or in proximity to others without being distracted by them. Dr. Kalil noted that Hall said he could concentrate for "excessive periods." Additionally, Hall's depressed mood and decreased energy would cause moderate limitation in his ability to complete a normal workday and workweek. He also had moderate limitation in the ability to adapt to changes in the work setting.

On reconsideration, Bert Spetzler, M.D., determined that Hall could perform light work, but stand or walk for only four hours in an eight-hour workday. R. 120. He attributed this decrease in function to Hall's susceptibility to fatigue easily, his decreased strength and dexterity in his right hand, arm, and leg, and his minimally impaired gait. Louis Perrott, Ph.D., echoed Dr. Kalil's findings as to Hall's mental limitations. R. 122–23.

D.    *Analysis*

At step two, the claimant must show that he has a "severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). This requires the ALJ to determine whether the claimant has at least one medically determinable "physical or mental impairment" and, if so, the degree to which the impairment or combination of impairments affects the claimant's ability to perform "basic work activities." SSR 96-3p, 1996 WL 374181, at *1–2 (July 2, 1996); 20 C.F.R. §§ 404.1520, 404.1523, 416.920, 416.923. A medically determinable impairment "results from anatomical, physiological, or psychological

17

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," such as walking, lifting, and dealing with normal workplace situations. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ at this step "will consider all evidence in [the] case record," 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3), except evidence about the claimant's age, education, and work experience, *id.* §§ 404.1520(c), 416.920(c). *See also id.* §§ 404.1529(c)(4), 416.929(c)(4). Determining that an impairment(s) is or "is not severe requires a careful evaluation of the medical findings that describe the impairment(s) . . . , and an informed judgment about the [functional] limitations and restrictions the impairment(s) and related symptom(s) impose" on the claimant. SSR 96-3p, 1996 WL 374181, at *2. "Symptoms, such as pain, . . . will not be found to affect the [claimant's] ability to do basic work activities unless the [claimant] first establishes by objective medical evidence . . . that he or she has a medically determinable physical or mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptoms."[5] *Id.* If the claimant clears this threshold, the ALJ must consider "the intensity, persistence, and limiting effects of the alleged symptom(s) . . . along with the objective medical and other evidence in determining whether the impairment or combination of impairments is severe." *Id.*

The latter analysis may require the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 16-3p, 2016 WL 1119029, at

---

[5] Objective medical evidence means "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

18

*4 (March 16, 2016); *accord* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); SSR 96-3p, 1996 WL 374181, at *2. The ALJ cannot reject the claimant's subjective description of his impairment "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *accord* SSR 96-3p, 1996 WL 374181, at *2. Rather, he must "consider all of the available evidence," 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1), including the claimant's other statements, evidence of his daily activities, his treatment history, the objective medical evidence, and medical-source statements or medical opinions,[6] *see id.* §§ 404.1529(c)(4), 416.929(c)(4); *see also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016). The ALJ also must give specific reasons "grounded in the evidence" for the weight assigned to a claimant's description of his impairment and related limitations. *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) (citing SSR 96-7p, 1996 WL 374186, at *4).

An impairment is "not severe only if it is a slight abnormality which has such a minimal effect on the [claimant] that it would not be expected to interfere" with a person's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks and emphasis omitted). This is not a difficult hurdle for the claimant to clear.[7] *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999); SSR 96-3p, 1996 WL 374181, at *2. Still, the court must affirm the ALJ's non-severity finding if it is consistent with the law and supported by substantial evidence in the record. *See Johnson*, 434 F.3d at 658; *Edmunds v. Colvin*, No.

---

[6] Medical opinions are statements from "acceptable medical sources," such as physicians and psychologists, that reflect judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

[7] Indeed, the ALJ must assume that the impairment or combination of impairments is severe and proceed to step three if, after "considering all of the evidence" in an adequately developed record, he cannot determine the impairment(s)' functional effect on the claimant's physical or mental ability to perform basic work activities. SSR 96-3p, 1996 WL 374181, at *2.

19

4:12cv51, slip op. at 1–2, 8–10 (W.D. Va. July 29, 2013) (Crigler, M.J.), *adopted by* 2013 WL 4451224, at *1 (Aug. 16, 2013) (Kiser, J.).

The ALJ found that Hall's headaches were a non-severe impairment and his "white outs" were not a medically determinable impairment. Noting that Hall received treatment for his headaches, the ALJ found that they did not cause more than a minimal effect over a twelve-month period. R. 18. As to Hall's "white outs," the ALJ found that Hall had not received any treatment, including from an eye doctor or neurologist, for this condition. R. 18. Moreover, the record contained no medical signs or laboratory findings that showed a "medical impairment which results from anatomical, physiological or psychological abnormalities and which could reasonably be expected to produce the symptoms alleged." *Id.*

At the outset, it is important to identify what impairment is at issue. The ALJ discussed Hall's headaches and "white outs" separately in assessing whether they were severe impairments. His reason for doing so is not clear. Once Hall began reporting that he experienced "white outs," he always said they immediately preceded his headaches. Hall's treating physicians addressed them together, diagnosing them as either the same or at least related impairments. *See, e.g.,* R. 1052 (Dr. Brogan assessing "chronic daily headaches manifesting as migraine with aura"); R. 1092 (Dr. DeGood diagnosed migraine headaches and stress related physiologic response affecting medical condition). The ALJ does not explain why he separated the headaches from the "white outs," and the record does not provide insight into the ALJ's reasoning. Rather, the record supports examining them together, which is how I will review the ALJ's step two analysis.

The ALJ did not question that Hall's headaches were a medically determinable impairment. *See* R. 18. Hall's treating physicians regularly diagnosed him with migraine or

tension headaches and prescribed medications or other remedies to alleviate them. The ALJ did question the severity and duration of the headaches. The record shows that the nature and quality of Hall's headaches changed over time. Thus, the ALJ's observation that they caused no more than minimal limitation finds some support. As early as 2008, Hall reported having headaches that he treated with pain medications. After his stroke, Hall was able to manage his headaches with medications from March through August 2011. As of August, however, Hall's headache symptoms, including the "white outs," would incapacitate him for three to four hours at a time, three to four days a week. Hall continued to report these symptoms to Dr. McLaughlin, to Dr. DeGood, and through the May 2012 examinations by Dr. Mathew and Dr. Showalter. Nothing in the record suggests that the headaches or related symptoms had abated or were likely to abate at the time of the ALJ's decision in September 2012. Thus, the record does not support the ALJ's determination that Hall's headaches caused only minimal limitations or did not meet the twelve-month duration requirement.

The ALJ may have questioned the existence of the most severe headache symptoms reported by Hall. The ALJ noted that no medical signs or laboratory findings established the "white outs." R. 18. This is a valid observation, but because the ALJ determined that the headaches were a medically determinable impairment, this observation does not end the inquiry into the existence of the reported symptoms. Hall's treating physicians addressed the "white outs" as related to Hall's migraine or tension headaches. Thus, like pain or any other symptom of a migraine headache, the ALJ needed to evaluate whether Hall's medically determinable impairment (migraine headache) could produce the symptom ("white outs") to the degree alleged. *See* SSR 96-3p, 1996 WL 374181, at *2. The ALJ, however, did not follow the

procedure for assessing the credibility of the symptoms or effects of Hall's migraine headaches.[8] The ALJ may be able to marshal the evidence and explain why it shows that Hall's reports of "white outs" and the severity of his headache symptoms are not entirely credible. That determination, however, is for the Commissioner to make in the first instance and for this Court to review for reasonableness.[9] In the absence of a proper credibility assessment, I cannot find that the ALJ's step two analysis of Hall's medically determinable headache impairment is supported by substantial evidence.

Because this case requires remand to properly evaluate Hall's claims at step two, I will not address his other arguments. The case must be remanded for further administrative proceedings to properly assess Hall's ability to perform work during the closed period of claimed disability. On remand, it will be incumbent upon the ALJ to conduct an RFC assessment that includes "a narrative discussion describing" how specific medical facts and nonmedical evidence

---

[8] In the section of his written opinion discussing the medical and opinion evidence, the ALJ also assessed Hall's credibility. The ALJ recited Hall's testimony about his symptoms and limitations, including his headache episodes and "white outs." R. 22. The ALJ followed that recitation with a boilerplate statement:

> After careful consideration of all of the evidence of record, the undersigned finds that the claimant's medically determinable impairments could be expected to produce some symptoms of the general type that have been alleged, but the claimant's and his ex-wife's contentions concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible in light of the longitudinal record as a whole.

R. 22. This boilerplate could contradict the step two finding in that the ALJ failed to explain which medically determinable impairments he determined could produce the general symptoms alleged, but not to the degree alleged. It certainly does not illuminate the ALJ's rationale for finding Hall's headaches non-severe. The ALJ's subsequent more detailed credibility discussion mentions Hall's "white outs" only in the context of pointing out inconsistencies in Hall's statements about his use of alcohol and controlled substances. R. 27. It does not address whether the ALJ found those complaints credible and if, as the case seems, he did not, the reasons for that determination. *See Mascio*, 780 F.3d at 640 ("Nowhere, however, does the ALJ explain how he decided which of Mascio's statements to believe and which to discredit."). Neither this discussion nor the boilerplate supports or further explains the ALJ's rationale at step two. Thus, the ALJ's discussion of the credibility of Hall's symptoms elsewhere in his opinion does not make up for his error at step two.

[9] The Commissioner argues that any error at step two would be harmless. Def.'s Br. 19, ECF No. 31. I must disagree. The ALJ did not include any limitations in Hall's RFC to account for his headaches or explain why such a limitation is not warranted. Thus, the error was not harmless.

"support[] each conclusion" in his RFC finding. *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). In making this assessment, "the ALJ 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).

IV. Conclusion

For the foregoing reasons, I find that the Commissioner's final decision is not supported by substantial evidence. Accordingly, the Court will **DENY** the Commissioner's motion for summary judgment, ECF No. 30, **REVERSE** the Commissioner's final decision, **REMAND** this case for further administrative proceedings, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 30, 2016

Joel C. Hoppe
United States Magistrate Judge